IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| PEGGY WEST on behalf of the United States of America and the State of Iowa,<br><br>Plaintiff/Relator,<br>v.<br><br>BERGMAN FOLKERS PLASTIC SURGERY PC and RONALD S. BERGMAN, D.O.,<br><br>Defendants. | CASE NO. 19cv3050-CJW<br><br><br>**QUI TAM COMPLAINT** |

COMES NOW Relator Peggy West who brings this qui tam action in the name of the United States of America and the State of Iowa, by and through her undersigned attorneys, and states as follows:

## INTRODUCTION

1. This is an action by qui tam Relator Peggy West on behalf the United States and the State of Iowa against Bergman Folkers Plastic Surgery PC and Defendant Ronald S. Bergman, D.O. to recover penalties and damages arising from false statements Defendants made regarding the accuracy and reliability of its billing for services in an effort to secure State and federal monies through the Medicaid and Medicare systems and for unlawful retaliation under State and Federal law.

## PARTIES

2. Relator Peggy West is and at all material times hereto was a resident of Polk County, Iowa and a Citizen of the State of Iowa.

1

3. Bergman Folkers Plastic Surgery, P.C. is an Iowa Professional Corporation licensed to do business in Iowa, whose registered agent is Ryan C. Nixon, and whose principal place of business is in Polk County, Iowa.

4. Upon information and belief, Defendant Ronald S. Bergman, D.O., is and at all material times hereto was a resident of Polk County, Iowa and a Citizen of the State of Iowa.

**JURISDICTION & VENUE**

5. This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Iowa False Claims Act, Iowa Code § 685 *et seq.*

6. This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) (False Claims Act), 28 U.S.C. § 1331 (Federal Question), and 28 U.S.C. § 1367.

7. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because (i) Defendants transact business in this district and did so at all times relevant to this complaint; and, as alleged below; (ii) Defendants committed acts proscribed by 28 U.S.C. § 3729 – acts giving rise to this action – within this district.

8. A written disclosure statement setting forth and enclosing material evidence and information the Relator possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2), has been served upon the United States, and pursuant to the requirements of Iowa Code § 685.3 such written disclosure has been served upon the State of Iowa.

9. Relator West has complied with all other conditions precedent to bringing this action.

10. Relator West is the original source of, and has direct and independent knowledge of, any disclosed information on which any allegations herein might be deemed based, and has

voluntarily provided such information to the Government before filing this action. Specific disclosures include:

(i) That Defendants repeatedly and continuously "upcoded" services, i.e., coded minor or brief patient services as more extensive and costly services, and submitted the "upcoded" charges to Medicare, Medicaid and other insurers for payments that exceeded that which was supported by medical documentation.

(ii) That Defendants repeatedly and continuously submitted to Medicare bills for services performed by Physician Assistant Anne M. Nelson, who is not credentialed by Medicare and is not a Medicare-participating provider, under Dr. Bergman's name for 100% of fee schedule reimbursement, and accepted payment for Ms. Nelson's services as if Dr. Bergman had performed those services himself.

(iii) That Defendants repeatedly and continuously submitted to Medicare under Dr. Bergman's name bills for services performed by certain physicians participating in the Mercy Hospital fellowship program whom Dr. Bergman supervised, and accepted payment for such services as if Dr. Bergman had performed the services himself.

## MATERIAL FACTS

11. Enacted in 1965 through amendments to the Social Security Act, Medicaid is a health and long-term care coverage program that is jointly financed by states and the federal government that serves persons of all ages whose income and resources are insufficient to pay for health care. Medicaid is the largest source of funding for medical and health-related services for people with low income in the United States. Medicaid is funded by both the United States and the State of Iowa.

12. Each state establishes and administers its own Medicaid program and determines the type, amount, duration, and scope of services covered within broad federal guidelines. States must cover certain mandatory benefits and may choose to provide other optional benefits.

13. The State of Iowa provides Medicaid coverage, and thus makes payments, for certain medical procedures as described herein.

14. Enacted in 1965 through amendments to the Social Security Act, Medicare is a hospital and medical care coverage program that is funded through payroll taxes levied against employers and workers and revenue from the United States treasury. It covers persons with disabilities, end-stage renal disease requiring dialysis or kidney transplant, and person over 65 years of age. As of 2018, 59.9 million individuals were covered by the Medicare program.

15. The Medicare program is administered by the federal Center or Medicare and Medicaid Services (CMS), a component of the United States Department of Health and Human Services. CMS determines the type, amount, duration, and scope of services covered within federal guidelines.

16. Defendants accepted Medicare and Medicaid monies in return for medical and surgical services performed at their two Polk County clinic locations, 2000 Grand Avenue and 411 Laurel Suite 1300, at numerous other clinical locations throughout the State of Iowa, and at affiliated hospitals.

17. At all times material hereto, Defendant Ronald S. Bergman, D.O. had staff privileges at Mercy Hospital in Des Moines, Polk County, Iowa and performed medical and surgical services at Mercy Hospital.

18. For the over thirty years since Dr. Bergman has been in practice, he and other providers associated with Bergman Folkers Plastic Surgery have provided medical and surgical services to thousands of Iowa citizens.

19. In June 2019, Defendants recruited Peggy West from her employer at the time and offered her what appeared to be a rewarding career opportunity with Bergman Folkers Plastic Surgery as its "Practice Administrator."

20. West accepted the offer and started the Practice Administrator position at Bergman Folkers Plastic Surgery on June 10, 2019.

21. West's duties as the Practice Administrator at Bergman Folkers Plastic Surgery entailed managing and supervising the company's administrative and financial operations, including the insurance claim submission and reimbursement processes.

22. In her efforts to familiarize herself with the clinic's financial, bookkeeping and claim processes over the weeks following her hire, West noted that there were significant coding issues with claims that were submitted to Medicare, Medicaid and private insurance companies for payment, in which service codes used were inconsistent with the services rendered according to medical documentation of the visits in question.

23. Specifically, West noted repeated instances where Medicare, Medicaid and private insurers were "upcoded," i.e., they were billed for more complex or extensive visits than those which were reflected in the corresponding medical documentation.

35. The CPT codes West observed being most frequently "upcoded" were:

- Office visits (99202, 99203, 99204) (not supported by medical documentation)

- Established patient (98212, 99213, 99214)

- ER Consults (99282, 99283, 99284) (Mercy Hospital Fellows would see emergency room patients while Dr. Bergman was not present and there would be

5

no documentation from Dr. Bergman. If the patient required immediate surgery, Dr. Bergman would attend).

- Inpatient consults/np (99241, 99242, 99243, 99244)

36. Dr. Bergman would frequently bill a "Level 3" visit regardless of the condition, place of service, or actual services rendered as reflected in medical documentation. When West explained to him what documentation was required to support a Level 3 billing and why he was billing incorrectly, Dr. Bergman stated that he had been billing this way for many years and said to West, "Why are you making this so hard?"

37. West noted that Dr. Bergman used a system called Allscript Practice Management and had maintained electronic health records for at least 5 years. West believes based on her review of those records that he had been "upcoding" for at least the last 5 years.

24. West initially concluded that it may have been an issue of training for the clinic's coders. On approximately June 30, 2019, West informed Dr. Bergman that his services were not being coded correctly and told him that she was going to be reviewing his charts so that she could train a new coder on how to properly code his services, as the clinic's coder had resigned.

25. In response, Dr. Bergman grew angry and referred to the coder as a "dumb cunt."

26. On approximately August 26, 2019, West was reviewing billing records for services performed by Dr. Bergman's Physician Assistant, Anne Nelson, and noticed the "billing provider" section on the HICFA1500 billing form indicated that Dr. Bergman had performed the services. Ms. Nelson's name was nowhere on the form to indicate that she was the treating provider. In short, Dr. Bergman was billing Medicare for services performed by his Physician Assistant, Anne Nelson, under his own Medicare number and as if he was performing those services himself. He was being paid 100% of the fee schedule for the services Ms. Nelson performed with no physician supervision.

27. Later that day on August 26, 2019, West informed the office staff that they must stop submitting bills for Ms. Nelson's services as if Dr. Bergman had performed them.

28. The following day, on about August 27, 2019, West reviewed clinical records and confirmed that Dr. Bergman also had not reviewed and signed off on clinical records for services performed by Ms. Nelson as required under the "incident to" guidelines for Medicare submissions.

29. That same day, West confronted Dr. Bergman and told him that all billing for Ms. Nelson's services were stopping immediately. West told Dr. Bergman that it was fraudulent to submit claims under his own name for services Ms. Nelson had performed. West also told Dr. Bergman that she had reviewed the medical documentation and that he was noncompliant with Medicare billing guidelines in that he was not reviewing and signing off on Ms. Nelson's clinical documentation, nor was he directly supervising her services as required.

30. Ms. Nelson routinely saw patients in clinics throughout the State of Iowa under agreements with those clinics, with no on-site supervision by Dr. Bergman.

31. West told Dr. Bergman that they needed to self-report to Medicare, draft a correction plan, and correct all of the claims submitted for Ms. Nelson's services.

32. Dr. Bergman was not receptive to West's comments or proposal. He put his hand up and said, "Peggy, Peggy, Peggy, you need to calm down. I think you're getting ahead of yourself. We've been doing it this way for fourteen years." He then put his hands down, leaned forward toward West, stared her in the eye, and said, "Robyn knows the head of the Medicare fraud investigation department . . . Don't do something you're going to regret."

33. "Robyn" was Robyn Bartholomew, Dr. Bergman's girlfriend and a full-time detective with the Polk County Sheriff's Department.

7

34. Over the period of August 27 and/or 28, West reviewed records regarding Ms. Nelson and confirmed that she was not a credentialed Medicare provider, nor was she a participating Medicare provider.

35. The next day, on about August 29, 2017, West confronted Dr. Bergman again about Ms. Nelson and the Medicare fraud issue. West showed Dr. Bergman Medicare reimbursement records showing Medicare receipts for Ms. Nelson's services in the amount of $831,152.22.

36. West told Dr. Bergman she had reviewed records and confirmed that Anne Nelson was not credentialed as a Medicare provider and was not a Medicare-participating provider. She told him again that it was fraudulent to submit claims for a non-participating provider under a participating provider's name. She told him all of the funds received for services performed by Ms. Nelson must be returned to Medicare.

37. Dr. Bergman became angry and refused to return the funds to Medicare.

38. West reiterated that his actions were fraudulent.

39. West had been keeping Ms. Nelson's patient encounter forms in her office after informing staff not to submit them for payment in order to prevent fraudulent filings. A few days after West confronted Dr. Bergman on about August 29, she was unable to find Ms. Nelson's patient encounter forms. West asked Sarah Hurm, the biller, if she knew where they were. Ms. Hurm told West that Taylor Benskin, the receptionist, took them. West confronted Ms. Benskin, who informed West that Dr. Bergman had directed her to resume submitting Nelson's claims under Dr. Bergman's name as if he had performed them himself.

40. During the same time period, West also discovered that Dr. Bergman was charging for services performed by fellows he was overseeing through a Mercy Hospital fellowship program as if he himself had performed them.

41. Mercy Hospital paid Bergman and Folkers Plastic Surgery approximately $11,500 per quarter to supervise the fellows, who were licensed physicians participating in a plastic surgery fellowship to obtain certification in plastic surgery.

42. The fellows would see patients at the clinic's Laurel Street office on Mondays and Wednesdays as follow up visits to patients they had treated at the hospital.

43. West observed through clinic billing records that the clinic was billing insurers, including Medicare, for emergency room visits performed by fellows as if Dr. Bergman had performed those services himself.

44. West also observed through clinic billing records that the clinic was billing insurers, including Medicare, for in-office visits performed by fellows as if Dr. Bergman had performed those services himself.

45. West reviewed medical records to confirm whether the "teaching physician" requirements for Medicare reimbursement were being met and found no documentation from Dr. Bergman that he was actively involved in the patients' direct care.

46. Claims submitted by Dr. Bergman for services performed by the fellows did not contain the required "GC modifier" under the Medicare reimbursement program that would indicate that services were performed in part by a fellow under the direction of a teaching physician, which if submitted correctly would result in a lower reimbursement for such claims.

47. On approximately August 30, 2019, West showed Dr. Bergman written information setting forth the proper billing processes for teaching physicians and informed him that Dr. Bergman did not follow them.

48. Dr. Bergman again grew angry and told West that he would continue to bill for services performed by fellows, as if he had performed them himself, that they had always done so, and that he had no intention of changing his billing practices.

49. At all relevant times hereto, Dr. Bergman was in a romantic relationship with Robin Bartholomew, a full-time detective employed by the Polk County Sheriff's Department.

50. Ms. Bartholomew was also a patient of Dr. Bergman's and he had treated her as recently as 2018.

51. Throughout West's employment with Defendants, Defendants paid Ms. Bartholomew approximately $2,000 per month for unknown reasons.

52. Throughout West's employment at the clinic, Ms. Bartholomew spent much of her time at the clinic's Grand Avenue location, openly brandishing her weapon.

53. Beginning on the same day that West confronted Dr. Bergman with his fraudulent activities, and continuing throughout the remainder of West's employment, Ms. Bartholomew would walk past West and glare at her in a threatening way while openly displaying her gun on her hip.

54. Dr. Bergman also began to make repeated comments to West that he "knew a lot of people," that he "could make people disappear," and that he had close ties to the "Mexican mafia."

55. Ms. Bartholomew would also harass West with repeated text messages and phone calls.

56. West began to experience significant fear and anxiety. She felt threatened at work and even at home based on Dr. Bergman's and Ms. Bartholomew's actions and statements.

57. On approximately September 12, 2019, West was at work and received a hand-delivered copy of an Iowa Civil Rights Commission sexual harassment complaint that a former employee had filed against Dr. Bergman.

58. West opened the complaint and began reading it. She was immediately disgusted by the graphic sexual nature of the allegations the employee made against Dr. Bergman.

54. This was the second sexual harassment complaint against Dr. Bergman that West had received during her short tenure working with the clinic.

55. Dr. Bergman had made graphic sexual remarks and had shown West pornographic images during her employment as well.

56. The second sexual harassment complaint was the final straw and West decided to submit her resignation.

57. As West was collecting her belongings, she received a phone call from Steve Shindler, Dr. Bergman's attorney.

58. Shindler asked West if she had received a copy of a complaint and instructed her not to read it, but to hand-deliver it to his office.

59. Shindler also told West to be very careful because she was being followed.

60. West went to Shindler's office the next day and informed him that she was resigning due to the harassing and threatening work environment and illegal activities.

61. West's last date of employment with Bergman Folkers Plastic Surgery was September 12, 2019.

11

62. During Relator West's tenure with Bergman Folkers Plastic Surgery she acquired firsthand knowledge of the false claims described herein. Each described act or omission was knowingly committed by Defendants in an attempt to falsely secure State and federal funds through billing for services that were upcoded or were performed by individuals other than Dr. Bergman but were billed as if Dr. Bergman had performed them himself.

63. Likewise, one may reasonably infer that as Defendants billed the government for similar and related services, discovery of other requests for payment unquestionably would reveal numerous similar (if not identical) and additional misstatements in Defendants' attempts to receive funds to which they were not entitled.

## COUNT I
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729 *et seq.*

64. Relator West incorporates all paragraphs set forth above as if fully set forth herein.

65. As described in this Qui Tam Complaint, Defendants, individually, and by and through their officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the United States Government a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State and federal Governments; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State and federal Governments.

66. Defendants authorized and ratified the violations of the federal False Claims Acts committed by their various officers, agents, and employees.

67. The United States Government has been damaged as a result of Defendants' violations of the federal False Claims Act.

68. Relator Peggy West was threatened, harassed, retaliated against and constructively discharged by Defendants in violation of 31 U.S.C. § 3730(h) and has been damaged as a result of Defendants' unlawful conduct.

## COUNT II
## VIOLATIONS OF THE IOWA FALSE CLAIMS ACT
## Iowa Code § 685 *et seq.*

69. Relator Peggy West incorporates all paragraphs set forth above as if fully set forth herein.

70. As described in this Qui Tam Complaint, Defendants, individually, and by and through their officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the State of Iowa a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by Government of the State of Iowa; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government of the State of Iowa.

69. Defendants authorized and ratified the violations of the Iowa False Claims Act committed by their various officers, agents, and employees.

70. The State of Iowa has been damaged as a result of Defendants' violations of the Iowa False Claims Act.

71. Relator Peggy West was threatened, harassed, retaliated against and constructively discharged by Defendants as a result of her complaints regarding Defendants'

violations of the Iowa False Claims Act and has been damaged as a result of Defendants' unlawful conduct.

72. Pursuant to Iowa False Claims Act, Iowa Code § 685 *et seq.*, Relator Peggy West is a Qui Tam Plaintiff.

73. As such, Qui Tam Plaintiff Peggy West asserts the above allegations as they relate to violations listed in Iowa Code § 685.2 and otherwise set forth in Iowa law.

**WHEREFORE**, Relator Peggy West, on behalf of herself, the United States Government, and the State of Iowa, prays:

(i) that this Court enter a judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

(ii) that this Court enter a judgment against Defendants for a civil penalty of $10,000 for each of Defendants' violations of the False Claims Act;

(iii) that Relator Peggy West recover all costs of this action, with interest, including the cost to the United States Government and the State of Iowa for their expenses related to this action;

(iv) that Relator Peggy West be awarded all reasonable attorneys' fees in bringing this action;

(v) that in the event the United States Government and State of Iowa proceed with this action, Relator Peggy West be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

(vi) that in the event the United States Government and State of Iowa do not proceed with this action, Relator Peggy West be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

(vii) that Relator Peggy West receive front pay and receive 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and/or discrimination she endured;

(viii) that Relator Peggy West be awarded prejudgment interest;

(ix) that a trial by jury be held on all issues so triable; and

(x) that Relator Peggy West, the United States of America and the State of Iowa receive all relief to which they may be entitled at law or in equity.

## JURY DEMAND

**COMES NOW** Relator Peggy West, on behalf of herself, the United States of America and the State of Iowa, by and through her undersigned attorneys, and requests a trial by jury.

Respectfully submitted,

By /s/ Melissa C. Hasso
Melissa C. Hasso  AT0009833
Mark D. Sherinian  AT0007173
Emily E. Wilson  AT0013860
SHERINIAN & HASSO LAW FIRM
521 E. Locust St., Suite 300
Des Moines, IA  50309
Telephone: (515) 224-2079
Facsimile: (515) 224-2321
E-mail: mhasso@sherinianlaw.com
          sherinianlaw@msn.com
          ewilson@sherinianlaw.com